# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| PATRICK FRANKLIN, | ) |
| Plaintiff, | ) |
| vs. | ) Case No. 3:17-cv-960-GCS |
| VIPIN SHAH, | ) |
| Defendant. | ) |

## MEMORANDUM AND ORDER

**SISON, Magistrate Judge:**

Plaintiff Patrick Franklin brings a claim under 42 U.S.C. § 1983 alleging that the defendant, Dr. Vipin Shah, violated the Eighth Amendment's prohibition against cruel and unusual punishment by being deliberately indifferent to Franklin's serious medical need. Specifically, Franklin claims that: (1) Dr. Shah rejected Franklin's request for a lower bunk permit despite Franklin's obesity making it difficult to climb the ladder to his bed, leading to Franklin falling and injuring his elbow; and (2) Dr. Shah failed to properly treat Franklin's injury because he discontinued his pain medication and did not make greater efforts to diagnose his injury. Before the Court is Defendant's motion for summary judgment under Federal Rule of Civil Procedure 56. (Doc. 40). For the reasons delineated below, the Court **GRANTS in part** and **DENIES in part** Defendant's motion for summary judgment.

## FINDINGS OF FACT

As construed in the light most favorable to the nonmoving party,[1] the facts are as follows:

Franklin is an inmate who arrived at Robinson Correctional Center ("Robinson") on August 2, 2016. (Doc. 41-2, 9:2-10). Upon arriving, Franklin requested a bottom bunk because his weight made it difficult to climb the ladder to his bed. (Doc. 1, 5). His counselor, Ms. Carrol, informed Franklin that because his cellmate was leaving, he could have the lower bunk. (Doc. 41-2, 18:9-14). Ms. Carrol placed Franklin in a lower bunk, but never gave him an official lower bunk permit. (Doc. 41-2, 19:11-23). In April of 2017, Franklin moved to the top bunk so that a wheelchair-bound inmate could have the lower bunk. (Doc. 1, 10).

Around this time, Franklin, who was 5' 6" and weighed 350 pounds, was having issues with climbing the ladder to his top bunk. (Doc. 1, 5, 10). Franklin sent an Offender Request form to Dr. Shah on April 4, 2017, asking to be moved to a lower bunk because he was overweight and had difficulty going up to and climbing down from his bunk. (Doc. 1, 10). An unsigned staff response to Franklin's request stated, "[p]lease attend gym, reduce food intake." (Doc. 1, 10).

Franklin sent a second Offender Request form to Dr. Shah on April 6, 2019, again requesting to be moved to a lower bunk and explaining that he had fallen while going up to and climbing down from his bunk. (Doc. 1, 10). A signed staff response to Franklin's

---

[1] *See Tolan v. Cotton*, 572 U.S. 650, 651 (2014).

request stated, in handwriting different from the first response, "[s]ign up for sick call to discuss low bunk and to be weighed." (Doc. 1, 10; Doc. 41-2, 26:21-24). Both parties dispute if the signature below the staff response is Dr. Shah's. (Doc. 41-2, 25:20-24, 26:1-13). Dr. Shah claims he did not receive or review either request form. (Doc. 41-3, ¶ 6-7).

After receiving the staff response to his second Offender Request, Franklin went to the Healthcare Unit ("HCU") to sign up for sick call. (Doc. 41 Ex. B, 24:5-10). While at the HCU, Franklin told a nurse about his issue with his bunk assignment. (Doc. 41 Ex. B, 24:7-15). Later, Franklin alleges, he spoke to Dr. Shah about his bunk assignment. (Doc. 41 Ex. B, 24:5-24, 25:1). Dr. Shah claims that he has no recollection of speaking with Franklin at that time. (Doc. 41 Ex. C, ¶ 9).

Either late at night on April 12, 2017, or early in the morning on April 13, 2017, Franklin missed a step on the ladder while descending from his top bunk and fell, landing on his right shoulder, left elbow, and lower back. (Doc. 41-2, 28:17-24, 29:1-24, 30:1-9). His cellmates helped him back up to his top bunk. (Doc. 41-2, 30:10-17). Franklin did not request medical care immediately following his fall. (Doc. 41-2, 21-23).

Franklin went to the gym on April 13, 2017, and while stretching heard his arm pop for the first time. (Doc. 41-2, 30:24, 31:1-7). After hearing his arm pop, Franklin approached a nearby Corrections Officer and explained what had happened overnight. (Doc. 41-2, 31:14-19). The Corrections Officer sent Franklin to the HCU. (Doc. 41-2, 31:14-19).

While at the HCU, Franklin spoke to a nurse. (Doc. 41-2, 31:23-24, 32:1). The nurse noted that, among other things, Franklin's elbow made a loud pop when he straightened

his arm, there was slight swelling, and his pain level was an 8 out of 10.² (Doc. 41-1, 3). The nurse referred him to a physician, told him to splint and elevate his extremity, and provided a cold pack, pain medication, and a sling. (Doc. 41-1, 3).

Later that day, Franklin met Dr. Shah while waiting on the MD Call Line. (Doc. 41-3, ¶ 12). Franklin reiterated the circumstances leading to his injury. (Doc. 41-1, 6). Dr. Shah performed a physical examination and noted that Franklin's elbow made a noise when straightened. (Doc. 41-2, 6). He ordered a left x-ray with four views, told Franklin to continue using the arm sling for two weeks, prescribed 500 milligrams of Naprosyn, ordered a follow-up appointment after two-weeks, instructed him to use Ibuprofen until the Naprosyn became available, and granted Franklin a lower bunk permit for 12 months. (Doc. 41-1, 6, 37).

On April 14, 2017, Franklin received an x-ray on his left elbow. (Doc. 41-1, 7, 34). The radiologist noted in his report that the x-ray showed no convincing evidence of an acute bony fracture or dislocation, but that there might have been elevation of the anterior elbow fat pad indicating a joint effusion. (Doc 41-1, 34). The radiologist recommended that a follow-up study take place if Franklin's symptoms persisted. (Doc 41-1, 34).

Franklin had a follow-up appointment with Dr. Shah on April 27, 2017. (Doc. 41-1, 10).³ Franklin stated that his arm popped when he moved his left elbow, and that his

---

²     The nurse also recorded that Franklin's injuries either occurred from a fall the previous night or from lifting weights that day. (Doc. 41-1, 3). Franklin asserts that he did not lift weights the day he saw the nurse. (Doc. 41-2, 31:8-10, 33:14-16).

³     Prior to his follow-up appointment, Franklin twice reported to nurse sick call complaining about elbow pain. (Doc. 41 Ex. A, 8, 9). On the first visit the nurse gave him a cold pack, and on the second

arm pain made it painful to walk unless he held his arm close to his chest. (Doc. 41-1, 10). Dr. Shah examined Franklin's left elbow, observed swelling, noted the negative x-ray, and instructed Franklin to exercise, use his sling as needed, continue using Naprosyn, and return in three weeks. (Doc. 41-1, 10).

On May 18, 2017, Franklin went to Dr. Shah for a second follow-up appointment. (Doc. 41-1, 11). Dr. Shah examined the left elbow, noted that there was no swelling or discoloration, that Franklin's elbow popped, that the left elbow was not tender, and that the x-ray was negative. (Doc. 41-1, 11). He told Franklin to keep using the sling for one month, to continue exercising, and to return in one month. (Doc. 41-1, 11).

Around this time, Dr. Shah discontinued Franklin's pain medication. (Doc. 41-2, 47:14-24, 48:1-3). On May 18, 2017, Franklin filed a grievance report claiming that Dr. Shah refused to provide pain medication. (Doc. 1, 17). He explained that Dr. Shah told him to purchase pain medication at the commissary. (Doc. 41-2, 47:14-24, 48:1-3). The grievance officer denied Franklin's request. (Doc. 1, 18). The parties dispute whether Franklin could always afford to buy pain medication at the commissary. (Doc. 41-2, 53:14-24, 54:1-5; Doc. 41 ¶ 27).

On June 19, 2017, Franklin saw Dr. Shah for a third follow-up appointment. (Doc 41-1, 12). Franklin told Dr. Shah that his elbow hurt. (Doc. 41-1, 12). After conducting a physical examination, Dr. Shah noted that Franklin's elbow popped and that there was no swelling. Dr. Shah ordered a second x-ray of the left elbow to compare with the prior

---

visit the nurse told him to continue using Naprosyn as directed. (Doc. 41 Ex. A, 8, 9). Both times the nurses said Franklin would see a physician at his follow-up appointment. (Doc. 41 Ex. A, 8, 9).

x-ray and scheduled a follow-up appointment in three weeks. (Doc. 41-1, 12).[4]

Franklin's x-ray was taken on June 23, 2017. (Doc. 41-1, 13). The radiologist compared the x-ray to the previous x-ray and concluded that there was no fracture, dislocation, bony abnormality, or joint effusion. (Doc. 41-1, 35).

Franklin's fourth follow-up appointment took place on July 11, 2017. (Doc. 41-1, 13). Franklin stated his elbow was tender and kept popping, and he requested a specialist. (Doc. 41-1, 13). Dr. Shah examined Franklin's elbow and noted that there was no popping and that the x-ray was negative. (Doc. 41-1, 13). Dr. Shah prescribed 400 milligrams of Ibuprofen to be taken twice a day as needed for one month, advised him on passive exercise, told him not to lift weights or put strain on his left elbow, and ordered a follow-up in one month. (Doc. 41-1, 13, 39).

After this appointment, Franklin filed a grievance request on July 11, 2017, expressing dissatisfaction with Dr. Shah and asking to see an outside doctor for a second opinion. (Doc. 1, 15). The Clinical Services Supervisor believed Franklin's grievance request was duplicitous and denied it. (Doc. 1, 14).

Several more appointments with Dr. Shah followed. (Doc. 41-1, 13-14, 16, 20, 22). Dr. Shah continued to prescribe Ibuprofen to Franklin and renewed Franklin's lower bunk permit for 12 additional months. (Doc. 41-1, 13-14, 16-20). The last appointment occurred on July 18, 2018, when Dr. Shah referred Franklin to Dr. David for a second opinion. (Doc. 41-1, 22). While with Dr. David, Franklin underwent a third x-ray which

---

[4] Franklin filed another grievance request at this time reiterating his complaint that Dr. Shah discontinued his pain medication. His grievance request was denied.

gave no convincing evidence of an acute bony fracture or sizable joint diffusion. (Doc. 41-1, 25-26). At a September 7, 2018 appointment, Dr. David noted that Franklin had degenerative joint disease[5] and prescribed him an anti-inflammatory drug used to treat arthritis. (Doc. 41-1, 29, 53). On November 27, 2018, a third physician diagnosed Franklin with transient joint pain. (Doc. 41-1, 31). Franklin continues to complain of intermittent elbow pain and that his elbow pops. (Doc. 41-2, 94:5-21).

Franklin has named Dr. Shah as a defendant. In his sole count, he claims that Dr. Shah violated the Eighth Amendment's prohibition regarding cruel and unusual punishment by showing deliberate indifference to Franklin's serious medical need for a low bunk permit and for treatment for pain associated with injuries he sustained while climbing down from his top bunk. Dr. Shah filed a motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure. (Doc. 41).

## LEGAL STANDARDS

### I. Summary Judgment Standard

Federal Rule of Civil Procedure 56 governs motions for summary judgment. Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. *See Archdiocese of Milwaukee v. Doe*, 743 F.3d 1101, 1105 (7th Cir. 2014)(citing FED. R. CIV. PROC. 56(a)). *Accord Anderson v. Donahoe*, 699 F.3d 989, 994 (7th Cir. 2012). A genuine issue of

---

[5] Degenerative joint disease is also called osteoarthritis. *See* American Academy of Physical Medicine and Rehabilitation, *Degenerative, Joint Disease*, AAPM&R, https://www.aapmr.org/about-physiatry/conditions-treatments/pain-neuromuscular-medicine-rehabilitation/degenerative-joint-disease (last visited Feb. 21, 2020).

material fact remains "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). *Accord Bunn v. Khoury Enterpr., Inc.*, 753 F.3d 676, 681-682 (7th Cir. 2014).

In assessing a summary judgment motion, the district court views the facts in the light most favorable to, and draws all reasonable inferences in favor of, the nonmoving party. *See Anderson*, 699 F.3d at 994; *Delapaz v. Richardson*, 634 F.3d 895, 899 (7th Cir. 2011). As the Seventh Circuit has explained, as required by Rule 56(a), "we set forth the facts by examining the evidence in the light reasonably most favorable to the non-moving party, giving [him] the benefit of reasonable, favorable inferences and resolving conflicts in the evidence in [his] favor." *Spaine v. Community Contracts, Inc.*, 756 F.3d 542, 544 (7th Cir. 2014).

## II. Eighth Amendment Deliberate Indifference

The Eighth Amendment prohibits cruel and unusual punishment, and deliberate indifference to the "serious medical needs of a prisoner constitutes the unnecessary and wanton infliction of pain forbidden by the Constitution." *Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 828 (7th Cir. 2009). A prisoner is not "entitled to demand specific care[,]" but is only "entitled to reasonable measures to meet a substantial risk of serious harm . . . ." *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997).

In order to prevail on a claim of deliberate indifference, a prisoner who brings an Eighth Amendment challenge of constitutionally-deficient medical care must satisfy a two-part test. *See Arnett v. Webster*, 658 F.3d 742, 750 (7th Cir. 2011). The first consideration is whether the prisoner has an "objectively serious medical condition."

*Arnett*, 658 F.3d at 750. *Accord Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005). "A medical condition is objectively serious if a physician has diagnosed it as requiring treatment, or the need for treatment would be obvious to a layperson." *Hammond v. Rector*, 123 F. Supp. 3d 1076, 1084 (S.D. Ill. 2015)(citing *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014)). It is not necessary for such a medical condition to "be life-threatening to be serious; rather, it could be a condition that would result in further significant injury or unnecessary and wanton infliction of pain if not treated." *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010). *Accord Farmer v. Brennan*, 511 U.S. 825, 828 (1994)(violating the Eighth Amendment requires "deliberate indifference to a *substantial* risk of *serious* harm") (internal quotation marks omitted) (emphasis added).

The second consideration requires a prisoner to show that a prison official has subjective knowledge of – and then disregards – an excessive risk to inmate health. *See Greeno*, 414 F.3d at 653. A plaintiff need not show the individual "literally ignored" his complaint, but that the individual was aware of the condition and either knowingly or recklessly disregarded it. *Hayes v. Snyder*, 546 F.3d 516, 524 (7th Cir. 2008). "Something more than negligence or even malpractice is required" to prove deliberate indifference. *Pyles*, 771 F.3d at 409. *See also Hammond*, 123 F. Supp. 3d at 1086 (stating that "[i]solated occurrences of deficient medical treatment are generally insufficient to establish . . . deliberate indifference."). Deliberate indifference involves "intentional or reckless conduct, not mere negligence." *Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010)(citing *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010)).

Assessing the subjective prong is more difficult in cases alleging inadequate care

as opposed to a lack of care. Without more, a "mistake in professional judgment cannot be deliberate indifference." *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016). The Seventh Circuit has explained:

> By definition a treatment decision that's based on professional judgment cannot evince deliberate indifference because professional judgment implies a choice of what the defendant believed to be the best course of treatment. A doctor who claims to have exercised professional judgment is effectively asserting he lacked a sufficiently culpable mental state, and if no reasonable jury could discredit that claim, the doctor is entitled to summary judgment.

*Id.*

## ANALYSIS

Franklin alleges two distinct situations in which Dr. Shah was deliberately indifferent to his serious medical needs. The first involves Dr. Shah's alleged failure to provide Franklin with a lower bunk permit after Franklin sent two offender request forms asking for such a permit. The second involves Dr. Shah's alleged failure to provide proper treatment to Franklin after Franklin fell and injured his elbow and arm. Each situation shall be analyzed separately to determine if Franklin's claims as to each survive Dr. Shah's motion for summary judgment. The Court begins by examining Dr. Shah's medical treatment decisions following Franklin's fall.

**I. Deliberate Indifference of a Serious Medical Need Regarding Franklin's Arm and Elbow.**

Franklin brings two complaints about Dr. Shah's treatment. He first expresses dissatisfaction with Dr. Shah's inability to diagnose why Franklin's arm hurt and why his left elbow popped when extended. He also argues that Dr. Shah should not have stopped

prescribing pain medication while he continued to experience pain in his arm. To survive Dr. Shah's motion for summary judgment, Franklin must demonstrate that a reasonable jury could find that Dr. Shah showed deliberate indifference when he discontinued Franklin's pain medication or when he did not exert greater efforts in diagnosing Franklin's injury, and that treatment for either his arm pain or his elbow popping is a serious medical need. While Franklin's arm pain sufficiently establishes a serious medical need, the undersigned concludes that a reasonable jury could not find that Dr. Shah was deliberately indifferent to it.

### A. Franklin's Purported Serious Medical Need Following his Fall.

Franklin complains of two injuries: his arm pain and his elbow popping. First, a popping elbow is not "a condition that would result in further significant injury or unnecessary and wanton infliction of pain if not treated." *Gayton*, 593 F.3d at 620. Thus, this Court concludes that no reasonable jury would find that Franklin's popping elbow constituted a serious medical need. However, the pain in Franklin's arm was a serious medical need. Throughout his treatment, Franklin constantly complained of pain, at one point reporting his pain level was an "8 out of 10." Franklin occasionally used a sling, and once explained to a nurse that the pain made it difficult to walk unless he held his arm close to his chest. This evidence is sufficient to allow a reasonable juror to find that the treatment of Franklin's arm pain was a serious medical need.[6]

---

[6] Dr. Shah implicitly argues that Franklin could not have been experiencing serious arm pain because he was allegedly playing sports, doing push-ups while being treated, and his elbow was rarely

**B.     Dr. Shah's Alleged Deliberate Indifference During Franklin's Treatment.**

The record before the Court, however, would not permit a reasonable juror to conclude that Dr. Shah was deliberately indifferent to Franklin's arm pain. Dr. Shah's treatment of Franklin lasted for over a year,[7] throughout which Franklin had nine appointments and two x-rays. Many of these appointments were follow-ups, showing that Dr. Shah stayed apprised of Franklin's medical condition and any changes. Dr. Shah instructed Franklin on passive exercises, provided him with an arm sling to be used as needed, frequently prescribed pain medication, and gave him a lower bunk permit.

Significantly, when Franklin saw other physicians, their treatment was relatively similar. Dr. David also ordered an x-ray, which came back negative, instructed Franklin on exercises, and provided him with pain medication. The third physician, like Dr. Shah, provided pain medication and a lower bunk permit. In short, Dr. Shah's treatment was similar to the treatment Franklin received from other physicians. Nevertheless, Franklin continued to suffer from the same ailment. Given these facts, it cannot be said that Dr. Shah knowingly or recklessly disregarded Franklin's serious medical need.

Franklin also argues that doctors must explain the steps being taken to diagnose a medical condition and that Dr. Shah failed to do so. (Doc. 46, ¶ 38). Even crediting this assertion, Dr. Shah still acted to diagnose Franklin's problem by scheduling two x-rays and multiple follow-up appointments. Thus, even if Dr. Shah failed to explain the steps

---

ever tender or showed swelling. The dispute between the parties on the existence of Franklin's pain raises a genuine factual issue best resolved by the trier of fact.

7      Franklin's first appointment with Dr. Shah was on April 13, 2017, and his last appointment with Dr. Shah was on July 19, 2018.

he was taking, his actions are ultimately what matters, and such actions preclude this matter from rising to the level of deliberate indifference. *See, e.g., Pyles*, 771 F.3d at 409 (noting that to establish deliberate indifference "[s]omething more than negligence or even malpractice is required."). *See also Gutierrez v. Peters*, 111 F.3d 1364, 1374 (7th Cir. 1997)(stating that "medical malpractice in the form of an incorrect diagnosis or improper treatment does not state an Eighth Amendment claim.").

Franklin claims that Dr. Shah should have gone further in his efforts to diagnose his arm and elbow injury by scheduling an MRI. (Doc. 46, ¶¶ 24, 52). However, "[a]n MRI is simply a diagnostic tool, and the decision to forego diagnostic tests is 'a classic example of a matter for medical judgment.'" *Pyles*, 771 F.3d at 411 (quoting *Estelle v. Gamble*, 429 U.S. 97, 107 (1976)). The other two physicians who treated Franklin also did not schedule an MRI or refer Franklin to a specialist. Thus, there is insufficient evidence to allow a reasonable juror to conclude that Dr. Shah's medical judgment while trying to diagnose Franklin's injury "departed significantly from accepted professional norms." *Id.*

Finally, Franklin alleges that Dr. Shah was deliberately indifferent when he stopped prescribing Franklin pain medication and told him to purchase it from the commissary. Again, Franklin has not demonstrated that Dr. Shah's decision amounted to reckless or intentional neglect. The discontinuation of Franklin's pain medication lasted from sometime in May 2017 to July 11, 2017, when Dr. Shah resumed prescribing pain medication. According to Franklin, the commissary offered Motrin, Ibuprofen, and Tylenol. (Doc. 41 Ex. B, 53:14-20). Franklin claimed that he occasionally purchased pain

medication from the commissary after Dr. Shah refused to write further pain medication prescriptions. During the relevant period, Franklin's commissary purchase report reveals Franklin purchased $112.50 worth of goods, mostly snacks, but no pain medication.[8]

Franklin asserts that sometimes he was unable to afford pain medication. The commissary, however, offered a variety of pain medication. Franklin's purchase history reveals he never acquired pain medication from the commissary, and Franklin has not demonstrated he lacked the funds to purchase pain medication. Indeed, the evidence shows otherwise. Given this evidence, Franklin's assertion that he was unable to afford pain medication is merely self-serving and conclusory. *See, e.g., Payne v. Pualey*, 337 F.3d 767, 772-773 (7th Cir. 2003)(stating that "[c]onclusory allegations, unsupported by specific facts, will not suffice" to defeat a motion for summary judgment)(citing *Lujan v. Nat'l Wildlife Fed'n*, 497, U.S. 871, 888 (1990). *See also* FED. R. CIV. PROC. 56(e). In light of these facts, Dr. Shah's decision to discontinue prescribing Franklin pain medication does not amount to intentional or reckless misconduct.[9]

The record supports finding that Dr. Shah made a medical judgment that it was unnecessary at that time to continue prescribing medication and that Franklin could

---

[8] Dr. Shah also references that Franklin bought a flatscreen television from the commissary. (Doc. 41, ¶ 27, p. 19). However, since Franklin made that purchase in August, after Dr. Shah had resumed prescribing him pain medication, it is irrelevant to the issue of whether Franklin could afford pain medication when Dr. Shah stopped prescribing it.

[9] Importantly, besides his first prescription, all of Dr. Shah's prescriptions were for Ibuprofen, which was available at the commissary. Thus, this case is not one where a doctor stopped prescribing strong pain medication that was otherwise unavailable to the inmate.

procure pain medication as needed. He also determined it would be sufficient for Franklin to continue using the sling and to return for follow-up appointments to reassess his condition.[10] While it is clear this was not the treatment Franklin desired, a reasonable juror could not determine that the treatment demonstrated deliberate indifference to Franklin's serious medical needs.

Overall, Dr. Shah's decisions while treating Franklin at worst amount to negligence rather than reckless or intentional misconduct. Dr. Shah's conduct does not show "that [he] knew of a substantial risk of harm to [Franklin] and disregarded the risk." *Greeno*, 414 F.3d at 653. Thus, no reasonable jury could find that Dr. Shah was deliberately indifferent while treating Franklin's injuries after his fall. As to the treatment Franklin received following his fall, Dr. Shah's motion for summary judgment is granted.

## II. Deliberate Indifference to Serious Medical Need for Lower Bunk Permit.

Franklin's second claim alleges that Dr. Shah was deliberately indifferent to a serious medical need when he refused to provide Franklin with a lower bunk permit. To survive Dr. Shah's motion for summary judgment, Franklin must show that a reasonable trier of fact could find that being forced to use a top bunk while weighing 350 pounds posed a serious risk to Franklin's health and that Dr. Shah knew of the risk and intentionally or recklessly disregarded it. This Court concludes that Franklin makes such a showing.

The evidence shows that for Franklin, the question of receiving a lower bunk

---

[10] This Court also finds that, given that there is no evidence that Franklin ever purchased pain medication from the commissary while Dr. Shah stopped prescribing medication, no reasonable jury could find that treating the pain in Franklin's arm at this time was a serious medical need.

permit involved a serious medical need. At the time Franklin made his requests for a lower bunk permit he was 5 feet and 6 inches tall and weighed 350 pounds. In his offender request, he relayed having difficulty climbing up and down the ladder and that he had already fallen. When he arrived at Robinson, his counselor granted Franklin's request to be placed in a lower bunk. His counselor's immediate recognition that Franklin needed a lower bunk helps demonstrate that Franklin's "need for treatment would be obvious to a layperson." *Pyles*, 771 F.3d at 409. Granting a lower bunk permit would have been a "reasonable measure[] to meet a substantial risk of harm." *Forbes*, 112 F.3d at 267. Thus, this Court concludes that a reasonable juror could find that Franklin receiving a lower bunk permit was a serious medical need.

There is a genuine dispute between the parties over whether Dr. Shah ever received Franklin's offender request forms. Dr. Shah claimed in his affidavit that he has "no independent recollection of personally receiving or reviewing" Franklin's requests. According to Dr. Shah, it is typically not his responsibility to review offender request forms because nurses usually review them. If a nurse, rather than Dr. Shah, reviewed and responded to Franklin's request, then there is a strong argument that Dr. Shah cannot be held liable for the actions of another in this § 1983 action. *See Sanville v. McCaughtry*, 266 F.3d 724, 740 (7th Cir. 2001)(stating that "[t]he doctrine of *respondeat superior* does not apply to § 1983 actions . . . .")(citing *Chavez v. Illinois State Police*, 251 F.3d 612, 652 (7th Cir. 2001)).

Yet, a genuine dispute exists over whether Dr. Shah reviewed Franklin's request forms at the time Franklin sent them. Dr. Shah is employed as the medical director at

Robinson. Franklin listed Dr. Shah as the addressee of the offender request forms. A staff response is included at the bottom of each form, and the parties dispute if it is in Dr. Shah's handwriting. Dr. Shah does not provide any evidence that he did not review Franklin's request forms, and by stating that he *typically* does not review the forms a juror could make a reasonable inference that *sometimes* he does review them. Franklin's complaint in his offender request form –that he was overweight, had difficulty climbing up and down the ladder, and had already fallen while using the ladder– were sufficient to put whoever received the request on notice of the risk to Franklin's health.

Moreover, a reasonable juror could conclude that the staff response to Franklin's first offender request constitutes intentional or reckless disregard for Franklin's serious medical need. The staff response states, "[p]lease attend gym, decrease food intake." While perhaps proper advice for someone suffering from obesity, this response fails to address the substantial risk of falling faced by Franklin. It is not a stretch to envision a reasonable juror deciding that by not granting a lower bunk permit, the reviewing staff member intentionally or recklessly disregarded the serious risk of Franklin falling while climbing up and down the ladder to his bed. Therefore, this Court concludes that material issues of fact exist as to Franklin's claims related to his requests for a low-bunk permit and that a reasonable juror crediting his version of events could find that Dr. Shah was deliberately indifferent to Franklin's serious medical need when he did not grant him a permit.

## CONCLUSION

For the above-stated reasons, this Court **GRANTS in part** and **DENIES in part** Defendant Dr. Shah's motion for summary judgment. Defendant's motion is granted as to Plaintiff's claim for deliberate indifference to his arm and elbow pain but is denied as to his claim for deliberate indifference to his need for a low-bunk permit. Plaintiff Patrick Franklin's deliberate indifference claim related to his request for a low-bunk permit shall proceed to trial.

**IT IS SO ORDERED.**

Dated: February 28, 2020.

	Digitally signed by Magistrate Judge Gilbert C. Sison
	Date: 2020.02.28 12:39:46 -06'00'

_____
GILBERT C. SISON
United States Magistrate Judge